

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| DOUBLE H CONTRACTING, INC. and HECTOR HINOJOS, SR., | § | |
| | § | No. 08-23-00345-CV |
| Appellants, | | |
| | § | Appeal from |
| v. | § | 384th District Court of |
| EL PASO WATER UTILITIES PUBLIC SERVICE BOARD, as Agent for THE CITY OF EL PASO; THE CITY OF EL PASO; | § | of El Paso County, Texas |
| ZTEX CONSTRUCTION, INC.; and TAO INDUSTRIES, INC. d/b/a HAWK | § | (TC# 2023-DCV-1654) |
| CONSTRUCTION, | § | |
| Appellees. | § | |

# **O P I N I O N**

When El Paso's aging water utility pipelines break, the response is swift. Not so for the ensuing road repairs. With a growing backlog of projects, a swell of public complaints, and only one contractor engaged to tackle the work, the El Paso Water Utilities Public Service Board (EPWater) took action. Using a competitive sealed proposal process, EPWater solicited bids to engage multiple contractors to complete on-call road repair work. After EPWater entered contracts with all three responsive bidders, the highest ranked contractor sued, seeking declaratory and injunctive relief under statutes governing the contracting authority of municipalities (Chapter 252,

Local Government Code) and contracting procedures for construction projects (Chapter 2269, Government Code).

On appeal, the contractor—Double H Contracting, Inc. and its vice president, Hector Hinojos, Sr. (collectively, Double H)—challenges the trial court's summary judgment in favor of EPWater, the City of El Paso, ZTEX Construction, Inc. (ZTEX), and TAO Industries, Inc. d/b/a Hawk Construction (Hawk). Finding no error, we affirm.

## I. BACKGROUND

EPWater is a municipally owned utility that provides water, wastewater, reclaimed water, and stormwater services to El Paso and surroundings areas. EPWater is responsible for maintaining its distribution system, which includes over 2,800 miles of water lines, and performing repairs when damage occurs, including breaks or leaks. Gilbert Trejo, EPWater's Vice President of Operations and Technical Services, reported that EPWater's distribution system averages one main break per 4.2 miles of water line each year.

Portions of EPWater's distribution system lie beneath paved areas owned by the City of El Paso, including highways, streets, alleys, easements, sidewalks, curbs, and gutters. When EPWater needs to make a repair in a City right-of-way area, it cuts into and excavates the area as necessary to reach the damaged portion of the system. Once the repairs are complete, EPWater is responsible for repairing the area.

EPWater maintains an in-house operations crew dedicated to responding to necessary repairs to the water and wastewater utilities. After the utility repair is complete, EPWater leaves the site "in a way that is safe for the traffic to continue to be used or work . . . around it" until the permanent repair is complete. To provide a temporary fix, EPWater fills the trench with backfill. When necessary, EPWater also places a three-by-five-foot steel plate on top of the backfilled area

to protect the trench and provide a temporary surface for cars and pedestrians until an outside contractor can get to the actual repairs. That work includes assessing site conditions, determining the extent of necessary repairs, obtaining permits from the City of El Paso, and completing final repairs.

After collecting data over a three-to-four-year period regarding the average time street and right-of-way repairs take, EPWater concluded that the average time to repair a site had increased over time. EPWater had also received increased complaints from El Pasoans, including city council representatives, about the temporary steel plates—both the quantity and the length of time the plates were in place before the permanent fixes were effected. Based on that feedback, as well as media coverage regarding the same types of resident complaints, EPWater concluded it needed more contractors on hand to meet its street repair needs. EPWater determined that having multiple street repair contractors on call—rather than just one—was necessary to meet the demand.

EPWater's then-existing street repair contract was set to expire on July 11, 2023. So in March 2023, EPWater called for bids through Competitive Sealed Proposal Number 30-23 (CSP 30-23) to replace the current contract "with improved efficiency, productivity, and service levels." CSP 30-23 sought proposals from interested contractors to "furnish[] all labor, materials, equipment, transportation, and services on an as-needed basis" for "[r]epairs to street rights-of-ways to include repairs and[/]or replacement of asphalt or concrete pavement structures as well as other ancillary items like traffic control, steel plates, roadway stripping, curb and gutter, sidewalks, and driveways." It specified that the work would be performed "in connection with work performed by or on behalf of [EPWater] in the construction, maintenance, or emergency work for water, reclaimed water, wastewater, and storm water projects and will include paving projects[.]" It also provided that work would be assigned "on an as needed basis and at [EPWater's] discretion

through the issuance of Work Orders." To that end, CSP 30-23 clarified that the estimated quantity of work was "not guaranteed," and payment would be "based on actual quantities."

In describing the competitive sealed proposal evaluation and appeal process, CSP 30-23 noted that "EPWater reserves the right to select one or multiple highest ranked Offeror(s) that are determined to be qualified in accordance with the terms and selection criteria established by the CSP method of procurement." It specified that EPWater's Chief Technical Officer would negotiate, "starting with the highest ranked Offeror(s)[,]" but if no agreement could be reached within 30 days, "the Chief Technical Officer may, in the absence of a protest by the Selected Offeror(s), either (1) proceed to negotiate with the remaining Offeror(s) in the order of their ranking or (2) reject all offers." If an agreement with at least one contractor is reached, the EPWater President/CEO would then "recommend to the Public Service Board that the contract be awarded to the highest ranked Offeror(s)" with whom an agreement was reached.

Three contractors submitted proposals in response to CSP 30-23: Double H,[1] ZTex, and Hawk. A five-person selection committee scored each contractor's proposal on five criteria: cost proposal, experience and reputation, experience of key personnel, production capability, and project approach. The points were then totaled and averaged, such that each contractor had a final average score on a 100-point scale. Double H had the highest score, at 90.40, while Hawk scored 86.44 and ZTex scored 77.66.

EPWater awarded contracts to all three contractors for an estimated combined annual cost of $7.4M. Double H's contract (which is the only one that appears in the record) includes an option

---

[1] EPWater had previously awarded Double H the same contract in 2011; from 2011 through 2018, Double H performed hundreds of related work orders for EPWater.

to extend for two additional one-year periods. It also expressly incorporates CSP 30-23's instructions to bidders.

On May 25, 2023, Double H filed this suit for declaratory judgment, asserting violations of Texas Government Code Chapter 2269, which provides the procedures by which a governmental entity engages in the competitive sealed proposal method of procurement delivery, and Local Government Code Chapter 252, which outlines purchasing and contracting authority for municipalities. Double H argued that because it was the highest scoring bidder, it was the only contractor that met the requirements under the terms of CSP 30-23. It urged that neither Chapter 2269 nor Chapter 252 permits governmental entities using the competitive sealed proposal method to award contracts to more than one bidder. Double H also sought injunctive relief to try to block EPWater's contracts with Hawk and ZTEX, such that it would be the only contractor on call for future road work repairs (at least for the contract term). Finally, Double H asserted its entitlement to attorney's fees under the Declaratory Judgment Act. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009.

EPWater moved for traditional summary judgment. EPWater argued that Texas law does not prohibit issuing more than one contract out of a single competitive sealed proposal bid solicitation, urging that Double H's interpretation of Chapter 2269 and Chapter 252 is contrary to legislative intent and the canons of statutory construction. EPWater also asserted that its actions were consistent with its authority as a component unit of a home-rule municipality. Further, EPWater contended it was entitled to summary judgment on its affirmative defenses of estoppel and waiver. And EPWater argued it was alternatively entitled to summary judgment because the contracts cover forms of work pertaining to matters exempted from Chapter 252's requirements. *See* Tex. Loc. Gov't Code Ann. § 252.022(a). Specifically, EPWater argued that CSP 30-23 relates

5

to a procurement necessary (1) "because of a public calamity that requires the immediate appropriation of money to relieve the necessity of the municipality's residents or to preserve the property of the municipality," *id.* § 252.022(a)(1); (2) "to preserve or protect the public health or safety of the municipality's residents," *id.* § 252.022(a)(2); and (3) "because of unforeseen damage to public machinery, equipment, or other property," *id.* § 252.022(a)(3).

EPWater separately filed a plea to the jurisdiction, asserting its entitlement to governmental immunity and arguing that both plaintiffs lack standing. Following a hearing on both motions, the trial court denied EPWater's plea to the jurisdiction but granted its motion for summary judgment, entering final judgment for all defendants. The trial court's order also stated that "EPWater, in its sole discretion, should assign as much street repair work associated with CSP No. 30-23 as Double H appears capable of reasonably performing and that EPWater should additionally assign work to ZTEX and Hawk as EPWater believes to be necessary to obtain street repair work efficiently, effectively or timely, for the safety of the community."

Double H appealed the trial court's judgment. EPWater and the City of El Paso did not appeal the trial court's denial of the plea to the jurisdiction, nor does their joint appellees' brief raise any governmental immunity issue.[2]

## II. STANDARD OF REVIEW

We review summary judgments de novo. *McGehee v. Endeavor Acquisitions, LLC*, 603 S.W.3d 515, 521 (Tex. App.—El Paso 2020, no pet.). In a traditional motion for summary judgment, the moving party bears the burden to establish that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* We take as true all evidence favorable

---

[2] ZTEX and Hawk adopted by reference EPWater and the City of El Paso's brief under Texas Rule of Appellate Procedure 9.7.

to the non-movant, indulging every reasonable inference and resolving any doubts in the non-movant's favor. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 219 (Tex. 2017).

We review statutory construction issues de novo. *Broadway Nat'l Bank, Tr. of Mary Frances Evers Tr. v. Yates Energy Corp.*, 631 S.W.3d 16, 23 (Tex. 2021). Our goal is to effectuate the legislature's intent as indicated in the statute's text. *Id.* We determine the meaning of a statutory provision not by considering it in isolation but by looking to the statute as a whole. *Id.* at 23–24. We presume the legislature intended every word in a statute and purposefully omitted words not included. *Id.* at 24. And we apply definitions as supplied by the statute but interpret an undefined term according to its plain meaning, unless a different meaning is apparent from context or the plain meaning would lead to absurd results. *Id.*

## III. DISCUSSION

In six interrelated issues on appeal,[3] Double H challenges the trial court's order granting summary judgment for EPWater. We begin by determining whether Chapter 252 applies to CSP No. 30-23.

Chapter 252 of the Local Government Code governs the purchasing and contracting authority of municipalities. Before a municipality enters a contract that would require spending $50,000 or more from municipal funds, Chapter 252 requires it to follow one of the specified competitive procurement methods. Tex. Loc. Gov't Code Ann. § 252.021. Namely, it must:

---

[3] Specifically, Double H raises the following issues: (1) Local Government Code Chapter 252 is not applicable to CSP No. 30-23 because Government Code Chapter 2269 controls; (2) Government Code §§ 2269.151 through .155 do not permit EPWater to issue multiple contract awards under the same solicitation; (3) even if EPWater could have issued multiple contracts under the same solicitation, EPWater violated the terms of CSP No. 30-23 by awarding contracts to businesses other than the highest ranked proposer; (4) Local Government Code § 252.022 does not exempt EPWater from complying with Chapter 2269; (5) even assuming § 252.022(a)(2) applies to CSP No. 30-23, the specific repair work is not necessary to protect the public health and safety of residents; and (6) EPWater did not carry its burden of proof to establish estoppel or waiver.

7

(1) comply with the procedure prescribed by this subchapter and Subchapter C for competitive sealed bidding or competitive sealed proposals;

(2) use the reverse auction procedure, as defined by Section 2155.062(d), Government Code, for purchasing; or

(3) comply with a method described by Chapter 2269, Government Code.

*Id.* § 252.021(a).

But § 252.022 includes several general exemptions to which the chapter does not apply. *Id.* § 252.022. Relevant here, Chapter 252 "does not apply to an expenditure for . . . a procurement necessary to preserve or protect the public health or safety of the municipality's residents" (though the term "public health or safety" is not defined by the statutory scheme).[4] *Id.* § 252.022(a)(2).

A municipality's determination that this exemption applies is discretionary and "entitled to substantial deference" but is not insulated from judicial review. *Davray, Inc. v. City of Midlothian, Texas*, No. A.3:04-CV-0539-B, 2005 WL 1586574, at *9–10 (N.D. Tex. July 6, 2005) (applying Texas law) (citing Tex. Att'y Gen. Op. No. JM–881 (1988) and *City of Austin v. Nelson*, 45 S.W.2d 692, 694 (Tex. App.—Austin 1931, no writ)). That is, "courts cannot substitute their own judgments in place of a municipality's governing body, but where the municipality abuses its discretion in an illegal or arbitrary manner, or where the government's decision has no reasonable basis in the evidence, judicial review is appropriate." *Davray*, 2005 WL 1586574, at *10 (citing *Labrado v. County of El Paso*, 132 S.W.3d 581, 596 (Tex. App.—El Paso 2004, no pet.)). Whether the exemption applies to a procurement is a factual matter, which we review under the "deferential" arbitrary and capricious standard. *Id.* (citing *Labrado*, 132 S.W.3d at 597); *see also* Tex. Att'y Gen. Op. No. JC-0326 (2001) (noting that municipality "has discretion in the first instance to determine" whether the professional-services exemption applies for purposes of Local

---

[4] While at the trial court level, EPWater urged that additional exemptions applied, on appeal, the parties' briefing focuses on the public-health-and-safety exemption.

Government Code § 252.022); Tex. Att'y Gen. Op. No. JM–908 (1988) (noting county's determination that competitive bidding was not required based on public-health exemption under Chapter 262 of the Local Government Code is a factual matter). But when a municipality claims that an exemption applies, getting it out from under the competitive bidding scheme, it must produce "some evidentiary basis for its actions" if challenged. *Davray*, 2005 WL 1586574, at \*11.

If EPWater established the public-health-and-safety exemption, then Chapter 252 does not apply to CSP 30-23.[5] Double H argues that the type of work described by CSP 30-23 does not amount to a procurement necessary to protect the public health or safety of the municipality's residents. It maintains that while the initial repair work to the water system—which EPWater completes in-house—may constitute work necessary to address public health and safety risks, the scope of CSP 30-23 addresses the "non-emergency work of repairing public right-of-ways **after** the initial repairs have been completed by El Paso/EPWater's employees." In support, Double H points to an email from Jose Gutierrez, a Transportation Manager with the City of El Paso, responding to the following inquiry from Double H's president, Hector Hinojos Jr.:

> I am requesting a formal response in regard to emergency paving cut repair protocol with the City of El Paso and EPDOT.
>
> Several Questions in regard to what is considered emergency repair and normal paving cut repair have been requested.

---

[5] At oral argument, counsel for Double H contended that § 252.022(d) nonetheless required EPWater to follow the requirements of Chapter 2269—even if CSP 30-23 is exempt from Chapter 252. Section 252.022(d) states:

> This chapter does not apply to an expenditure described by Section 252.021(a) if the governing body of a municipality determines that a method described by Chapter 2269, Government Code, provides a better value for the municipality with respect to that expenditure than the procedures described in this chapter and the municipality adopts and uses a method described in that chapter with respect to that expenditure.

But here, nothing in the record suggests EPWater "determine[d] that a method described by Chapter 2269 . . . provides a better value" for CSP 30-23 (nor did Double H raise that argument to the trial court). Instead, EPWater established that the § 252.022(a)(2) public-health-or-safety exemption applies. Nothing in Chapter 252 mandates that a municipality nonetheless follow the requirements of Chapter 2269 when a § 252.022(a) exemption applies, nor has § 252.022(d) been interpreted in that manner.

As I understand, the procedure is that when [EPWater] encounters an emergency water main break, water service leak, sewer main break, sewer service leak and etc. The Emergency Status is only for the utility repair done by [EPWater].

As stated before only the utility service break or utility repair is only considered an emergency at the moment of utility repair in regard to the response for the community.

After the utility repair has been executed by [EPWater] staff/crews. The pavement restoration is not considered an emergency any longer? Correct?

. . .

Please elaborate on the protocol and procedure in regard to an emergency pavement restoration repair. I understand that the utility repair is the only phase considered an emergency.

Pavement Restoration is no longer considered an emergency, correct? Please Advise.

Mr. Gutierrez responded by citing to a municipal code stating: "When an emergency occurs that requires an excavation, no permit shall be required prior to beginning work needed to respond to the emergency. All other work shall not proceed until a permit has been issued." He clarified that "the restoration of a utility cut is not an emergency and is related to scheduled work resulting in a permit requirement. Emergencies exist only when there is a present danger to life, health or property, including but not limited to utility service outage."

Based on this email, Double H contends that by EPWater's own admission, "the restoration work performed under CSP 30-23 is not an emergency triggering an exception under § 252.022." And it urges that "a mere connection with emergency work performed by El Paso/EPWater independently of CSP 30-23 is not sufficient to grant CSP 30-23 the same status as the actual emergency work" performed in-house. Double H contends that under such a rule, "most all construction activity could be couched under this exception."

EPWater responds that CSP 30-23 was issued to "resolve, as soon as possible, the large backlog of unrepaired ROW cuts that existed around the City" and "to create a system of multiple overlapping contractors that would assure that future backlogs are not created in the future." It

10

maintains that "the maintenance of public roadways, sidewalks, and driveways in good condition, and the act of keeping them free of obstacles and available for normal use, was central to the health and safety of local residents." EPWater points to instances in the record that it contends establish an evidentiary basis for its determination that CSP 30-23 called for a procurement necessary to preserve or protect the public health or safety of El Pasoans, including Mr. Trejo's affidavit, in which he attested that the contracts entered into as a result of CSP 30-23 were "necessary to . . . local public health and safety considerations and/or the protection of public property" because, among other things, they would:

(a) Promote the faster completion of City ROW repair projects that are awaiting repairs, allowing excavated areas to be closed more quickly and allowing traffic control devices and signage to be removed from roadways or sidewalks;

(b) Allow the faster removal and re-setting of steel plates located in roadways which have the potential to shift as a result of passing traffic;

(c) Help relieve public concerns regarding potential safety hazards to motorists or pedestrians from the presence of ROW repair work in or near roadways or sidewalks;

(d) Help reduce vehicular traffic and congestion that may be caused in part by repair projects and traffic control devices in roadways;

(e) Allow normal traffic flow on roads and the normal usage of City sidewalks by pedestrians so that El Pasoans can access their homes and businesses more efficiently;

(f) Protect public property (System utility pipelines, facilities and City roadways) by reducing the amount of time that excavated areas are open and subjected to potential damage from exposure to the weather, passing traffic or other factors;

(g) Help reduce public expenses from ongoing City ROW repair projects (i.e., expenses related to construction cost inflation and from the daily rental of traffic control devices, steel plates, and cement enhanced soil material, known as '2-sack' and '4-sack') that increase when those projects are prolonged due to the absence of available contractors.

11

EPWater also cited to Mr. Trejo's deposition testimony echoing these reasons, as well as photos depicting the condition of various sites awaiting permanent repair work and indicating disrupted traffic.

Given that evidence, EPWater established a sufficient basis for its determination that the CSP 30-23 procurement was necessary to preserve or protect the public health or safety of the municipality's residents. This conclusion as to CSP 30-23 is congruent with procurements other courts have found to fall within the public-health-and-safety exemption. *See, e.g.*, *In re USA Promlite Tech. Inc*, 636 B.R. 743, 761–62 (Bankr. S.D. Tex. 2022) (mem. op.) (applying Texas law and concluding contract to retrofit lighting with LED bulbs and equipment fell within the § 252.022 public-health exemption because lights "are used to prevent crime"); *City of Mission v. BFI Waste Services of Texas, LP*, No. 7:12-CV-139, 2013 WL 12100805, at *5 (S.D. Tex. July 19, 2013) (applying Texas law and concluding contracts for the collection and disposal of solid waste fall within the public-health exemption defined in § 252.022); *Wight Realty Interests, Ltd. v. City of Friendswood*, 433 S.W.3d 26, 36 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (concluding that services related to the development of youth recreational sports facilities may fall within the public-health exemption defined in § 252.022); *see also Williams v. De Fee*, 77 S.W.2d 729, 732 (Tex. App.—Amarillo 1934, no writ) (opining that "the acts of the commissioners' court in repairing the three miles of road and rebuilding the bridges can be justified upon the ground that it was necessary for the court to act to relieve the necessity of the citizens, and especially school children who habitually travel said road," then affirming on other grounds); Tex Att'y Gen. Op. No. JC-0281, 2000 WL 1279859, at *3 (concluding city's contract with temporary day labor agency for employment of garbage collection workers would be exempted from competitive bidding requirements of § 252.021 as necessary to preserve or protect public health).

12

And it comports with the way in which the purpose of a statutory public-health exemption has long been interpreted. *See Browning-Ferris, Inc. v. City of Leon Valley*, 590 S.W.2d 729, 734 (Tex. App.—San Antonio 1979, writ ref'd n.r.e.) ("The words 'preserve' and 'protect,' as applied to public health, carry the idea of timely, efficient, and effective action which keeps intact and unimpaired the good health of the citizens in advance of its impairment." (quoting *Hoffman v. City of Mt. Pleasant*, 89 S.W.2d 193, 194 (Tex. 1936)). Indeed, an amici curiae brief submitted by the Texas Municipal League—a non-profit association of over 1,170 incorporated cities—and the Texas City Attorneys Association—an organization of over 500 attorneys who represent Texas cities and city officials—represents that cities rely on the flexibility offered by this exemption in keeping city streets safe and functional.

Though Double H points to Mr. Gutierrez's email as evidence purportedly undermining EPWater's claim that the public-health-and-safety exemption applies, Mr. Gutierrez's email concerns whether contractors must obtain a permit before beginning work related to pavement restoration. Whether something is an "emergency" for municipal permitting purposes does not bear on whether an expenditure for a procurement is necessary to preserve or protect the public health or safety of the municipality's residents under Chapter 252. Because EPWater's assessment of the necessity to preserve or protect the public health or safety in this context has a reasonable basis in evidence, and has not otherwise been refuted by contrary evidence so as to raise a genuine issue of material fact, we conclude that § 252.022(a)(2) applies, rendering Chapter 252 inapplicable to CSP 30-23. *See Davray*, 2005 WL 1586574, at *10; *Labrado*, 132 S.W.3d at 596. Accordingly, EPWater did not need to comply with the competitive bidding practices defined in § 252.021. And because § 252.021 incorporates the competitive sealed proposal process defined

by Chapter 2269,[6] neither Chapter 252 nor Chapter 2269 applied to CSP 30-23.[7] *See* Tex. Loc. Gov't Code Ann. § 252.022(a); *Davray*, 2005 WL 1586574, at \*8 ("[O]nce § 252.022 is triggered, the other provisions of Chapter 252 are rendered nugatory.").

Nonetheless, EPWater issued CSP 30-23 through a competitive sealed proposal process modeled after Chapter 2269 Subchapter D but adjusted to allow for the possibility of procuring multiple contractors for road repair work through the same solicitation. Even when a statutory exemption applies, nothing prevents EPWater from engaging in a competitive bidding process. *See Patten v. Concho County*, 196 S.W.2d 833, 835 (Tex. App.—Austin 1946, no writ) (noting that even if a county expenditure is not subject to competitive bidding requirements, commissioners court may still use discretion to use competitive bidding process if "good business management" requires it); *see also Skypark Aviation, LLC v. Lind*, 523 S.W.3d 869, 875 (Tex. App.—Eastland 2017, no pet.) ("[T]he leasing of a county airport for operational purposes is not subject to competitive bidding requirements. The fact that Ector County chose to utilize procedures similar to the requirements of the County Purchasing Act does not make the requirements of the Act applicable to its request for proposal." (citation omitted)).

To the contrary, it makes sense that despite the exemption, EPWater—and municipalities across Texas for that matter—would engage in a similar process as EPWater did here to associate multiple contractors in an effort to keep public streets safe and functional in a timely manner. It certainly helps protect against "corruption or incompetence." *See GADV, Inc. v. Beaumont Indep. Sch. Dist.*, No. 1:11-CV-187, 2011 WL 2220242, at \*1 (E.D. Tex. June 7, 2011) ("Bidding procedures to protect the public treasury from corruption or incompetence have been adopted since

---

[6] That means there is no conflict-of-laws issue under § 2269.003, as Double H suggests.

[7] Double H's Issues One, Two, Four, and Five are overruled.

colonial times and were part of the reformist response to local officials such as Boss Tweed, of Tammany Hall fame."). Chapter 2269 provides helpful options, as it details several procurement methods by which a governmental entity may contract with a contractor, including a competitive sealed proposal method "by which a governmental entity requests proposals, ranks the offerors, negotiates as prescribed, and then contracts with a general contractor for the construction, rehabilitation, alteration, or repair of a facility." Tex. Gov't Code Ann. § 2269.151(a). Chapter 2269's competitive sealed proposal method provided a fine base template for CSP 30-23, allowing EPWater to protect the public safety in a responsible manner, helping "stimulate competition, prevent favoritism and secure the best work and materials at the lowest practicable price, for the best interests and benefit of the taxpayers and property owners." *City of Dallas v. Gadberry Constr. Co., Inc.*, No. 05-22-00665-CV, 2023 WL 4446291, at \*6 (Tex. App.—Dallas July 11, 2023, no pet.) (quoting *Sterrett v. Bell*, 240 S.W.2d 516, 520 (Tex. App.—Dallas 1951, no writ)).

Of course, EPWater must adhere to the terms it sets forth in its proposal solicitation processes. *See Labrado*, 132 S.W.3d at 598 ("The term 'competitive bidding' contemplates that each bidder will bid on the same material terms and will receive fair and equal treatment."). Here, CSP 30-23 stated "EPWater reserves the right . . . to accept any or multiple Offers that are determined to be qualified in accordance with the terms and selection criteria as established by the CSP method of procurement." And that's what it did.[8] EPWater followed the steps outlined in CSP 30-23, including making a best value determination for all offerors. And while EPWater identified Double H as the "highest ranked" bidder, it determined that ZTEX and Hawk were also

---

[8] Double H's Issue Three is thus overruled.

"qualified in accordance with the terms and selection criteria" outlined in CSP 30-23 before extending contracts to all three offerors.[9]

Because EPWater established that the public-health-and-safety exemption to Chapter 252 applies, rendering the requirements of Chapter 252 and Chapter 2269 inapplicable to CSP 30-23, and because EPWater adhered to the competitive sealed proposal process it put forth, the trial court did not err by granting EPWater's motion for summary judgment.

## IV. CONCLUSION

Having overruled Double H's issues on appeal, we affirm the trial court's judgment.

LISA J. SOTO, Justice

October 29, 2024

Before Alley, C.J., Palafox and Soto, JJ.
Palafox, J., dissenting

---

[9] Based on our disposition, we need not reach Double H's Issue Six.

16